IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**STEPHANIE STARK,**   Case 5:15 CV 477

    Plaintiff,

    v.   Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.   MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Stephanie Stark ("Plaintiff") filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Local Rule 72.2(b)(1). (Doc. 14). For the reasons stated below, the Commissioner's decision is affirmed in part and reversed and remanded in part.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB on February 7, 2011, alleging a disability onset date of September 20, 2007. (Tr. 163). Plaintiff applied for benefits due to polycystic ovarian syndrome, diabetes with insulin resistance, diabetic retinopathy, neuropathy, asthma, hypoxia, depression, hypercholesterolemia, carpal tunnel syndrome, sleep apnea, and restless leg syndrome. (Tr. 91). Her claim was denied initially (Tr. 91-104) and upon reconsideration (Tr. 106-19). Plaintiff requested a hearing before an administrative law judge ("ALJ") on March 7, 2012. (Tr. 129). On July 3, 2013, Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a

hearing before the ALJ; after which she found Plaintiff not disabled. (Tr. 11-31, 32-69). Plaintiff appealed the decision but the Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1). Plaintiff filed the instant action on March 12, 2015. (Doc. 1).

## FACTUAL BACKGROUND

### *Personal Background and Testimony*

Born June 28, 1964, Plaintiff was 49 years old at the hearing before the ALJ. (Tr. 40). She lived in a house with four minor children – ages six, seven, eight, and seventeen. (Tr. 40-41). Plaintiff testified she drove frequently but only for short distances. (Tr. 41). She had an Associate's degree and past work as a respiratory technician. (Tr. 41).

Plaintiff alleged she was unable to work due to her diabetes, asthma, sleep apnea, and neuropathy in her hands and feet. (Tr. 42). She testified she was diagnosed with carpal tunnel syndrome approximately fifteen years before but it had "progressively gotten worse." (Tr. 43). She reported problems doing her hair, dropping items, and numbness, but stated she could complete forms, use a keyboard, and crochet or sew for short periods. (Tr. 43, 218). Plaintiff reported difficulty making dinner but stated she did the laundry and other light housework. (Tr. 46-47, 244-45, 464). Plaintiff reported shortness of breath and problems standing for long periods which inhibited her ability to perform household tasks. (Tr. 215, 244). She was capable of going to the store independently, managing money, socializing, and going to church. (Tr. 217-18, 246-47, 464).

After her gastric bypass surgery, Plaintiff stated she had frequent problems with vomiting and diarrhea which made controlling her blood sugars difficult. (Tr. 48-49). She also testified to issues with depression and anxiety that were not aided by medication. (Tr. 51). Plaintiff also

utilized home oxygen at night, although she was not compliant at the time of the hearing. (Tr. 55-56).

*Relevant Medical Evidence*

Plaintiff saw Dr. Suzanne Harold for diabetic control from 2007 through 2009. (Tr. 290-340). During this time, Plaintiff's blood sugar was mainly controlled (Tr. 291, 296, 303, 308); but there were periods of non-compliance (Tr. 293, 294). In spring 2009, Plaintiff had an insulin pump implanted to help control her blood sugar levels. (Tr. 304). At appointments with Dr. Harold, Plaintiff consistently complained of retinopathy and nephropathy but only occasionally of neuropathy. (Tr. 291, 293, 294, 296, 303, 308).

Ophthalmologist Richard Fuller diagnosed Plaintiff with non-proliferative diabetic retinopathy and macular edema in 2009 and 2010, respectively; but noted she had no visual limitations. (Tr. 343-44, 360). She received focal laser therapy on both eyes in 2010. (Tr. 360, 362).

An April 2010 chest x-ray revealed no lung consolidation or pleural effusion. (Tr. 422). On October 15, 2010, Plaintiff established care with Vincent Perkowski, D.O.; at the appointment, she denied any significant hypoglycemic episodes but was concerned about her feet swelling. (Tr. 401). A few months later, Plaintiff was admitted to the hospital with pneumonia and administered aerosol treatment. (Tr. 433-34). Upon discharge, her oxygen saturation had returned to normal and she was not restricted in any activities. (Tr. 436).

In January 2011, Plaintiff was admitted to the hospital with acute asthmatic bronchitis with hypoxia. (Tr. 380). Upon admission her oxygen saturation was low but this improved with the administration of nasal oxygen and nebulizer treatments. (Tr. 380). The doctor opined her oxygen desaturation was likely connected to sleep apnea and her obesity. (Tr. 387). A chest x-ray

3

taken at the visit showed low lung volumes, low respiratory effort, no congestion, and bibasilar atelectasis. (Tr. 391). It was also noted her diabetes was uncontrolled with her insulin pump. (Tr. 380). At follow-ups the next week, Plaintiff's lungs were clear to auscultation without wheezes or rales. (Tr. 394, 399, 668). She reported no longer needing to use oxygen during the daytime but still required it at night. (Tr. 415).

On January 31, 2011, Plaintiff underwent a polysomnography to test for sleep apnea. (Tr. 437). She was diagnosed with moderate obstructive sleep apnea and it was recommended she utilize a CPAP machine. (Tr. 438). A second polysomnography test revealed her sleep improved with administration of CPAP. (Tr. 451).

In spring 2011, Plaintiff reported being 60% compliant with goals to use diet and exercise to lose weight but also reported stress eating and not exercising consistently. (Tr. 457). She reported swimming and being active with her children as her main forms of exercise. (Tr. 399, 508, 510). She also complained of depression due to family stressors although she stated she had a large support system. (Tr. 457-58). Plaintiff had been on various medications for depression and anxiety, with mixed success. (Tr. 293, 297, 512).

Plaintiff was diagnosed with pneumonia again in July 2011 and admitted to the hospital. (Tr. 489). A chest x-ray showed upper lobe consolidation likely due to pneumonia. (Tr. 489, 497, 499). Plaintiff's pulmonologist, Donald Decoy M.D., reported that Plaintiff was not using her inhaler and had failed to get a refill on her prescription. (Tr. 670). Despite continued complaints of shortness of breath in November 2011, her chest was clear to auscultation and a pulmonary function test revealed only mild reduction in inspiratory flow. (Tr. 731, 736-37).

On December 22, 2011, Plaintiff had an endoscopy to address her gastroesophgeal reflux disease ("GERD") in preparation for bariatric surgery. (Tr. 728). In March 2012, Plaintiff

underwent bariatric surgery to assist in weight loss. (Tr. 696-98). In May 2012, she complained of nausea, vomiting, and difficulty swallowing from a gastrojejunal ulceration with stricture that resulted from the bypass surgery; she had multiple endoscopies to remedy the issue. (Tr. 719, 721, 723, 805). That same month, Plaintiff reported improved shortness of breath, reduced daytime sleepiness, and not utilizing her CPAP machine due to her weight loss. (Tr. 738). By September she had lost 83 pounds but her weight loss subsequently plateaued. (Tr. 677-80). However a month later, she still reported "feeling great" and having improved sleep, improved breathing, and no nausea or vomiting. (Tr. 741-42).

An April 2012 x-ray of Plaintiff's cervical spine taken after she complained of neck and back pain revealed mild degenerative changes but her vertebral disc heights were intact and she had no subluxation. (Tr. 798). A lumbar spine x-ray taken at the same time revealed only mild degenerative changes and no spondylolysis. (Tr. 798-99). These were Plaintiff's first complaints of joint or back pain. (Tr. 394-95, 401, 432, 581). She continued to complain of back pain that was treated with medication by Dr. Perkowski. (Tr. 553, 559).

Ahmad Alshoha, M.D., Plaintiff's endocrinologist, reported her diabetes was controlled with her insulin pump in August 2012. (Tr. 758). This was an improvement from prior visits which had shown variable blood sugar control. (Tr. 762-63, 766-67, 770, 773). On physical examination, she had clear lungs, no spinal pain, no leg edema, intact and symmetrical pulses, normal motor strength, and decreased sensation bilaterally in her feet; which was unchanged from other appointments. (Tr. 760, 764, 769, 772, 775-76). However, she repeatedly reported pain and swelling in her feet accompanied by neuropathy and diabetic ulcers. (Tr. 510, 527, 671, 788, 790, 794).

5

In April 2013, after her date last insured ("DLI"), Plaintiff's main complaints were neuropathy in her feet, numbness in her legs, and back pain which radiated into her legs. (Tr. 537). An MRI of the lumbar spine obtained due to Plaintiff's complaints of back pain showed "mild degenerative changes" and "no focal dis[c] herniation or significant canal stenosis". (Tr. 850). In June 14, 2013, Plaintiff had an electromyography/nerve conduction study to evaluate hand numbness; the diagnosis was moderate to severe carpal tunnel in her right wrist and moderate carpal tunnel in her left wrist. (Tr. 853).

*Opinion Evidence*

On June 27, 2013, Dr. Perkowski opined Plaintiff could only occasionally lift five pounds and frequently lift two pounds due to "nerve damage from neuropathy and carpal tunnel". (Tr. 851). She was also restricted to standing, walking, or sitting for up to one hour without interruption and two to three hours total due to diabetic neuropathy and arthritis in her tailbone. (Tr. 851). Dr. Perkowski believed she would need to be able to alternate postural positions at will and elevate her legs to 90 degrees. (Tr. 852). Despite these restrictions, Dr. Perkowski reported he did not prescribe a cane, walker, or wheelchair. (Tr. 852). He opined Plaintiff should rarely climb, balance, stoop, crouch, kneel, crawl, or perform fine manipulation. (Tr. 851-52). He concluded her carpal tunnel syndrome restricted her to only occasional reaching, pushing/pulling, and gross manipulation. (Tr. 852). Dr. Perkowski further restricted Plaintiff from heights, moving machinery, temperature extremes, and pulmonary irritants. (Tr. 852). He reported Plaintiff's conditions caused moderate pain that caused interference with her ability to concentrate, took her off task, caused absenteeism, and would require additional 30-60 minute breaks. (Tr. 852).

*State Agency Reviewers*

On initial review, Jerry McCloud, M.D., opined that as a result of her obesity and asthma, Plaintiff could only occasionally lift twenty pounds; frequently lift ten pounds; stand, sit, or walk for six hours in an eight-hour day; and had an unlimited ability to push and pull. (Tr. 100). She was further restricted to frequently climbing ramps/stairs, stooping, kneeling, crouching, or crawling; had no manipulative, visual, or communicative limitations; but should avoid even moderate exposure to fumes, odors, dusts, or gases; and avoid all hazards. (Tr. 100-01). On reconsideration, Steve McKee, M.D., concurred with Dr. McCloud's limitations. (Tr. 115-16).

On June 3, 2011, Caroline Lewin, Ph.D., found Plaintiff had only mild restrictions in her activities of daily living, social functioning, and concentration, persistence, and pace. (Tr. 98-99).

*Consultative Examiner*

Michael Harvan, Ph.D., performed a consultative examination of Plaintiff at the request of the State. (Tr. 461-67). Plaintiff reported mild history of depression that was improved with medication. (Tr. 463). She was observed to have clear thinking, goal-oriented thought process, full range of affect, low energy, no motor manifestations of anxiety, adequate attention and concentration, and mild depression. (Tr. 465-66). She was assessed a global assessment of functioning ("GAF") score of 65[1] and diagnosed with adjustment disorder. (Tr. 466). He opined

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

7

she had no limitation or only mild limitations in the relevant functional categories such that she would not be precluded from work. (Tr. 467).

*ALJ Decision*

In September 2013, the ALJ found Plaintiff had the severe impairments of obesity (reduced by bariatric surgery), diabetic neuropathy, Type II diabetes, history of retinopathy status post laser therapy, and mild degenerative disc disease; but these severe impairments did not meet or medically equal any listed impairment. (Tr. 16-18). The ALJ then found Plaintiff had the RFC to perform light work with the following limitations:

> [She] can occasionally lift and/or carry (including upward pulling) twenty pounds; frequently lift and/or carry (including upward pulling) ten pounds; stand and/or walk (with normal breaks) for about four hours in an eight-hour workday due to neuropathy; sit (with normal breaks) for about six hours in an eight-hour workday; push and/or pull (including operation of hand/foot controls); frequent foot controls bilaterally due to neuropathy; frequently climb ramps/stairs, stoop, kneel, crouch or crawl; unlimited balancing; never climb ladders, ropes, or scaffolds; should avoid moderate concentrated exposure to fumes, odors, dusts, gases, poor ventilation; avoid all exposure to hazards, machinery and unprotected heights; and no manipulative, visual, or communicative limitations.

(Tr. 18). Based on the VE testimony, the ALJ found Plaintiff could perform representative work as an information clerk, order clerk, and ticket checker; and thus, was not disabled. (Tr. 24).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y*

8

*of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). When reviewing the ALJ's decision for substantial evidence, this court "may look to any evidence in the record, regardless of whether it has been cited" by the ALJ. *Heston v. Comm'r of Soc. Sec.,* 245 F.3d 528, 535 (6th Cir. 2001). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

> 5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred because (1) she failed to properly evaluate the opinion of Dr. Perkowski; and (2) she improperly analyzed Plaintiff's credibility. (Doc. 15). Each argument will be addressed in turn.

### *Treating Physician*

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted

controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

The ALJ gave no weight to Dr. Perkowski's June 2013 opinion because it was given beyond the DLI and was not supported by the evidence in the record. (Tr. 23). In support of her reasoning that the opinion was unsupported by the record, she particularly attacked the inconsistent evidence related to the opined limitations in standing, walking, and sitting. (Tr. 23).

Since eligibility for DIB must be established prior to the DLI, i.e., December 31, 2012; "evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Comm'r of Soc. Sec.*, 88 F. App'x 841, 845 (6th Cir. 2004). Nonetheless, a treating physician's opinion rendered after the DLI "may be considered to the extent it illuminates [Plaintiff's] health before the expiration of [her] insured status." *Nagle v. Comm'r of Soc. Sec.,* 191 F.3d 452 (6th Cir. 1999). However to be given significant weight, this

retrospective opinion must be supported by relevant, objective evidence that was contemporaneous to the insured period. *See Strong*, 88 F. App'x at 845; *Cutlip v. Sec'y of Health & Human Servs.,* 25 F.3d 284, 287 (6th Cir. 1994); 20 C.F.R. § 404.1527(d)(2)-(3).

In his opinion, Dr. Perkowski cited neuropathy, carpal tunnel syndrome, and arthritis in the tailbone as the basis for his restrictions. (Tr. 851-52). In reviewing the medical evidence available from prior to the DLI, there is no objective support for two of the three listed conditions. Nowhere in the record are there reports of arthritis or pain in the tailbone; and aside from Plaintiff's own testimony, there is no objective evidence of carpal tunnel syndrome or even reports of wrist pain to her physicians. Accordingly, the restrictions based on these alleged diagnoses are not supported by contemporaneous record evidence. Furthermore, although neuropathy in Plaintiff's feet is well-documented, Dr. Perkowski had not prescribed any ambulatory devices or restricted her activity; and rather, encouraged her to exercise. (Tr. 399, 508, 852). Dr. Perkowski's actions during the relevant time period undermine claims that she was functionally unable to stand, sit, or walk. Thus after examining the pre-DLI record, Dr. Perkowski's opinion was not based on objective evidence and is only "minimally probative" of Plaintiff's condition during the relevant period. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).

In further discussing the insupportability of the stand/walk/sit limitation, the ALJ cited to x-rays which revealed Plaintiff only suffered from mild degenerative changes in her spine. (Tr. 23, 798-99). This fact is confirmed by an MRI completed only a few months before Dr. Perkowski's opinion, which proves her spinal degeneration remained stable and mild. (Tr. 850). Additionally, Plaintiff's endocrinologist consistently reported normal gait and motor strength in

her lower extremities despite the existence of decreased foot sensation. (Tr. 751, 756, 760, 764, 769, 772, 775-76).

Plaintiff argues Dr. Perkowski's hand limitations are supported by the June 2013[2] electromyography study (which confirmed the existence of her carpal tunnel) and her consistent testimony throughout the relevant period. (Doc. 15, at 19). As previously discussed, eligibility for DIB must be established during the insured period and evidence obtained afterward is "generally of little probative value". *Strong*, 88 F. App'x at 845. While the June 2013 study did establish carpal tunnel syndrome, the objective evidence in the record from before the DLI does not. At multiple points her physicians noted no motor or sensory deficits in her upper extremities, no neuropathy in her hands, and did not list hand pain as a complaint; a clear indication her hands were asymptomatic. (*See* Tr. 418, 434, 537, 549, 575, 753-76). Overall, the objective evidence from the relevant period did not support Dr. Perkowski's limitations.

Thus, the ALJ adequately discussed the supportability and consistency of Dr. Perkowski's opinion by citation to record evidence and discussion of the available medical opinions. As such, the decision to give no weight to Dr. Perkowski's opinion is supported by substantial evidence.

*Credibility*

When making a credibility finding, the ALJ must make a finding based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1. But, an ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004).

---

2. Plaintiff erroneously references a May 2013 electromyography study; however, the study was requested in May but not performed until June 2013. (Tr. 853).

"Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1. In evaluating credibility an ALJ considers certain factors:

>   (i) [A claimant's] daily activities;
>
>   (ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;
>
>   (iii) Precipitating and aggravating factors;
>
>   (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate your pain or other symptoms;
>
>   (v) Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [Plaintiff's] pain or other symptoms;
>
>   (vi) Any measures [Plaintiff] use or ha[s] used to relieve [a claimant's] pain or other symptoms; and
>
>   (vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).

Ultimately, it is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination accorded "great weight"). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters,* 127 F.3d at 531. The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476. The Court may not "try the case de novo, nor resolve conflicts in evidence . . . " *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

Plaintiff's second assignment of error attacks the ALJ's credibility determination,

alleging the ALJ failed to adequately discuss why she did not credit Plaintiff's reports of hand limitations. (Doc. 19, at 19-21). Plaintiff argues she consistently reported and testified to limitations in her manipulative abilities and the ALJ dismissed her complaints without analysis of the relevant regulatory factors. This argument is well-taken.

There is scant analysis of Plaintiff's alleged manipulative limitations in the ALJ's decision besides a summarization of her testimony. (Tr. 19). In fact, the ALJ does not discuss any medical evidence as relates to Plaintiff's hands throughout the rest of her opinion. While this is most likely due to the scarcity of medical evidence as relates to Plaintiff's hand complaints, it would be reasonable for the ALJ to mention this scarcity as a reason for finding Plaintiff's testimony incredible. *Strong v. Soc. Sec. Admin.,* 88 F. App'x 841, 846 (6th Cir. 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain.").

Here, the ALJ did not discuss her lack of complaints to physicians, her lack of treatment, or her potentially inconsistent activities of daily living such as doing light housework, going to the store, or driving; all of which could underpin a proper credibility analysis. The ALJ did not clearly articulate why she believed Plaintiff's statements to be incredible and as such, failed to perform the requisite analysis. *See Ott v. Astrue*, 2010 WL 3087421, at *8 (E.D. Tenn).

There remains the possibility that harmless error may rescue the ALJ's credibility determination. *Ulman v. Comm'r of Soc. Sec.,* 693 F.3d 709, 714 (6th Cir. 2012). "The harmless error analysis proceeds in two steps: 1) what was the ALJ's credibility finding, and 2) leaving the problematic reasoning aside, did the rest of the ALJ's reasons support that finding?" *New v. Colvin*, 2013 WL 4400522, at *6 (E.D. Ky). In this case, it is simply not possible to meet the

second criterion because the ALJ failed to provide any reasons for discounting the Plaintiff's credibility. In light of the strong preference for well-explained credibility determinations, the Court cannot ignore the ALJ's complete lack of analysis as relates to Plaintiff's credibility. As such, remand is appropriate for the ALJ to properly discuss Plaintiff's credibility.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Commissioner's decision is affirmed in part and reversed and remanded in part.


 s/James R. Knepp II
United States Magistrate Judge